**17 MAG 7463**   ORIGINAL

Approved: _____
ROBERT ALLEN
Assistant United States Attorney

Before:  HONORABLE GABRIEL W. GORENSTEIN
United States Magistrate Judge
Southern District of New York



- - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA         :   **SEALED COMPLAINT**
:
       - v. -                    :   Violations of 15 U.S.C. §§
                                 :   78j(b) & 78ff; 17 C.F.R.
LISA BERSHAN,                    :   § 240.10b-5; 18 U.S.C. §§
BARRY SCHWARTZ, and              :   371, 1343, and 2.
JOEL MARGULIES                   :
                                 :   COUNTY OF OFFENSES:
       Defendants.               :   New York
                                 :
- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

  ANGELA TASSONE, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Securities Fraud and Wire Fraud)

  1.  From at least in or about August 2015 through in or about August 2017, in the Southern District of New York and elsewhere, LISA BERSHAN, BARRY SCHWARTZ, and JOEL MARGULIES, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5; and wire fraud, in violation of Title 18, United States Code, Section 1343.

  2.  It was a part and object of the conspiracy that LISA BERSHAN, BARRY SCHWARTZ, and JOEL MARGULIES, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, would and did use and

1

employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

3.   It was a further part and object of the conspiracy that LISA BERSHAN, BARRY SCHWARTZ, and JOEL MARGULIES, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

Overt Acts

4.   In furtherance of the conspiracy and to effect its illegal objects, LISA BERSHAN, BARRY SCHWARTZ, and JOEL MARGULIES, the defendants, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about August 2015, BERSHAN and MARGULIES sent an individual ("Victim-1") emails soliciting an investment in a company that later became known as Starship Snacks Corp. ("Starship"). These emails contained, among other things, an agreement purporting to guarantee Victim-1's investment against any loss. BERSHAN subsequently encouraged Victim-1 to solicit investments in Starship from Victim-1's friends and family.

b.   In or about October 2015, BERSHAN and MARGULIES sent an email and a letter to investors in Starship stating, in substance and in part, that Starship was likely to be acquired by Monster Beverage Corp. ("Monster") in a share-for-share exchange that would be extremely lucrative for Starship's investors.

    c. In or about January 2016, BERSHAN and SCHWARTZ opened two bank accounts in the name of "Starship Snacks Corp.," at a JP Morgan Chase branch located in the Southern District of New York (the "JPM Starship Accounts"). Investors were subsequently directed to, and did, deposit or transfer funds into these accounts.

    d. In or about March 2016, MARGULIES sent an email to investors, including an individual who had invested over approximately $390,000 in Starship ("Victim-2"), stating, in substance and in part, that Starship was close to completing a deal with Monster.

    e. In or about October 2016, SCHWARTZ participated in a conference call with investors, including Victim-1 and Victim-2, during which SCHWARTZ falsely stated that Starship had received an offer to partner with or be acquired by Monster, that Starship had rejected the offer, and that Starship was pursuing alternative arrangements with Monster and Coca-Cola.

    (Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

  5. From at least in or about August 2015 through in or about August 2017, in the Southern District of New York and elsewhere, LISA BERSHAN, BARRY SCHWARTZ, and JOEL MARGULIES, the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, BERSHAN, SCHWARTZ, and MARGULIES caused investors to purchase stock in Starship through materially false representations, and subsequently misappropriated investor funds for their own use.

    (Title 15, United States Code, Sections 78j(b) & 78ff;
  Title 17, Code of Federal Regulations, Section 240.10b-5;
    and Title 18, United States Code, Section 2.)

## COUNT THREE
## (Wire Fraud)

6. From at least in or about August 2015 through in or about August 2017, in the Southern District of New York and elsewhere, LISA BERSHAN, BARRY SCHWARTZ, and JOEL MARGULIES, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BERSHAN, SCHWARTZ, and MARGULIES caused investors to purchase stock in Starship through materially false representations, and subsequently misappropriated investor funds for their own use.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

7. I am employed as a Special Agent with the FBI and have been for approximately three and a half years. I am currently assigned to a squad responsible for investigating fraud offenses, including violations of the federal securities laws. During the course of my career, I have participated in investigations of numerous such offenses, and have made and participated in arrests of individuals who have committed such offenses.

8. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including documents and information provided to me by representatives of the U.S. Securities and Exchange Commission ("SEC"), documents provided by financial institutions and solicited investors, and documents produced in response to judicially authorized search warrants. Because this affidavit is prepared for the limited purpose of establishing probable cause, I have not set forth each and every fact I have learned in connection with this investigation. Where communications and events are referred to herein, moreover, they are related in substance and in part. Where dates, figures, and calculations are set forth herein, they are approximate.

Overview of the Fraudulent Scheme

9. LISA BERSHAN, BARRY SCHWARTZ, and JOEL MARGULIES, the defendants, created a company initially called The Awake Company but later renamed Starship Snacks Corp. Between in or about August 2015 and August 2017, BERSHAN, SCHWARTZ, and MARGULIES raised over approximately $2 million from investors based primarily on the following misrepresentations: (1) that investments in Starship were guaranteed against losses, even though neither BERSHAN nor Starship had the ability to honor these guarantees; (2) that Starship was going to be acquired by Monster in a transaction that would be extremely lucrative for investors; and (3) that Starship was engaged in actual business operations and had developed and procured sample products, when, in actuality, it was not and had not. BERSHAN, SCHWARTZ, and MARGULIES also misappropriated significant amounts of investor funds for their own use.

Relevant Persons and Entities

10. Based on my participation in this investigation, I have learned the following, in substance and in part:

    a. Starship, which was initially called "The Awake Company, Inc.," purported to be in the business of developing and selling caffeinated chocolates and snacks. Both The Awake Company, Inc. and Starship are referred to herein as "Starship." At all times relevant here, Starship was controlled by LISA BERSHAN, BARRY SCHWARTZ, and JOEL MARGULIES, the defendants.

    b. BERSHAN purported to be the CEO, President, and Founder of Starship.

    c. SCHWARTZ purported to be the Secretary of Starship. SCHWARTZ also purported to be the CEO of another company called All American Pet Co. ("AAPC"), which, like Starship, was controlled by himself, BERSHAN, and MARGULIES. AAPC purported to be in the dog food business, and to have developed a type of "power bar" for dogs.

    d. MARGULIES worked for BERSHAN and SCHWARTZ at Starship, and was held out as a marketing expert.

    e. Monster Beverage Corp. is an American beverage company that manufactures, among other things, energy drinks, including a drink called "Monster Energy." Monster's shares are publicly traded on the NASDAQ stock exchange.

5

f.   Grupo Arcor ("Arcor") is an international food processing company.  Arcor has a U.S. based presence in Miami, Florida that is engaged in various businesses, including manufacturing products for third parties.

### Solicitation of Initial Investments in Starship

11.   Based on my review of emails and conversations with Victim-1 and other investors, I have learned the following, in substance and in part:

a.   In or about 2012 or 2013, Victim-1 invested approximately $160,000 to $180,000 in AAPC, which, as discussed above, was controlled by LISA BERSHAN, BARRY SCHWARTZ, and JOEL MARGULIES, the defendants.  Based on my conversations with Victim-1, I understand that Victim-1 invested in AAPC based on representations by BERSHAN and SCHWARTZ that AAPC's product would be in tens of thousands of stores within months and was already in production.  By in or about 2015, however, Victim-1 understood that Victim-1's investment in AAPC was valueless, and that AAPC was no longer conducting active business operations (to the extent it ever did).

b.   In or about May 2015, BERSHAN told Victim-1 that BERSHAN was no longer involved in AAPC and was instead developing a caffeinated snack.  During the following months, BERSHAN invited Victim-1 to invest in the development and sale of this product by purchasing shares of Starship.  In so doing, BERSHAN represented, in substance and in part, that (1) Starship was negotiating with Monster to support its product; and (2) Victim-1's investment would be guaranteed by Starship and personally by BERSHAN against any losses.  Specifically:

i.   On or about August 20, 2015, Victim-1 received a document purporting to guarantee that Victim-1 could purchase shares in Starship for $3/share with "no down-side risk."  The document provided, in part:

> [The] original $3.00 purchase price is guaranteed against any downside loss of principal.  The Company and Lisa Bershan, its founder, have committed to repurchase the Seed Shares at $3.00 per [share] on or after the one-year anniversary from the share purchase date.  To further assure Seed Shareholders, Lisa Bershan has personally guaranteed to add an interest payment of 5% . . . to compensate for the use of

6

> investor funds should the shares fail to meet expectations ($23+ within in [sic] one-year). Lisa Bershan also affirms that she will personally buy back the shares at the $3 purchase price should the company be unable to repurchase [them]. . . .
>
> These arrangements and affirmations offer Seed Share Investors no down-side risk with a personal guarantee of repayment in kind plus interest in addition to the upside potential of gains with the protection against share price dilution typically afforded only to Preferred Shareholders.

The document was signed by BERSHAN and MARGULIES.

        ii.    On or about August 20, 2015, BERSHAN sent Victim-1 an email with the subject line "Take the house." The email included a series of pictures of what appeared to be a large and expensive residence, including an image of BERSHAN sitting inside the home. On or about the same day, BERSHAN sent another email to Victim-1 with the subject line, "Just a glimpse- my parents sure as hell didn't leave me this." This email contained images that appeared to depict the interior and exterior of the same home, including seemingly expensive artwork and statues. Based on my training, experience, and conversations with investors, I understand that these images were sent, at least in part, as evidence of BERSHAN's ability to satisfy the aforementioned personal guarantee.

        iii.    On or about August 21, 2015, MARGULIES sent Victim-1 an email entitled, "The Awake Company." The email purported to summarize the investment opportunity and stated, in substance and in part, that representatives of Monster wanted to develop a caffeinated snack and had asked BERSHAN to develop the product. Specifically, MARGULIES stated:

> One of the original SEED Share investors in Monster was a former business associate of Lisa when she was in the Chip business. The rest of the story is easy to follow . . . . [T]he Monster guys are not only looking [to be in the salted snack business], but want theirs caffeinated to raise the FDA imposed limits on caffeine in beverages by delivering with dry food. Lisa got the call because she was successful at launching a chip brand on a relatively small budget by today's standards and in just months where others would need years. She also has experience with

  caffeinated candy and chocolates from another business she built and sold.

MARGULIES continued, "I understand that you and your associates would like more information, but we are under strict NDA's. . . . This is secret stuff."

  c. On or about August 21, 2015, Victim-1 arranged for approximately $25,000 to be wired to an account with Wells Fargo in the name of "Star Queens Inc." (the "WF Star Queens Account"). Victim-1 understood that this was an investment for which Victim-1 would receive stock in Starship. Based on my review of bank records, I understand that the WF Star Queens Account was opened by MARGULIES, who was listed as the owner of Star Queens Inc., and that BERSHAN and SCHWARTZ were signatories on the account.

  d. Around the time Victim-1 arranged for the above-referenced investment to be made in Starship, BERSHAN told Victim-1 that she needed approximately $200,000 for startup costs for Starship. In order to help raise this money, Victim-1 introduced other investors, including but not limited to Victim-2, to BERSHAN, SCHWARTZ, and MARGULIES. Victim-1, for example, forwarded the emails referenced above in subparagraphs (b) and (c) to Victim-2, who purchased approximately 6,666.67 shares of Starship stock in exchange for approximately $20,000 on or about August 25, 2015. This purchase was made pursuant to a document entitled, "Share Price Guarantee," which guaranteed Victim-2's investment against loss. The guarantee stated, in part:

> IF Common Seed Shares have not achieved a capitalized value of $23.00 to $25.00 per share on the one-year anniversary of their purchase, the Guarantor [defined as BERSHAN] agrees to wire transfer the original purchase price ($20,000) to the registered shareholder, with $21,000 [sic] in interest (5%), within 10 working days.

Based on my conversations with Victim-1, I understand that Victim-1 had successfully referred over approximately $200,000 of investments to BERSHAN, SCHWARTZ, and MARGULIES by in or about September 2015. BERSHAN subsequently told Victim-1 that BERSHAN intended to sell additional shares of Starship.

8

Solicitation of October 2015 Investments in Starship

12. Based on my review of emails and conversations with victims who invested in Starship, including Victim-1 and Victim-2, I have learned the following, in substance and in part:

    a. Starting in or about August 2015, LISA BERSHAN, BARRY SCHWARTZ, and JOEL MARGULIES, the defendants, made repeated representations to investors that Starship was close to a deal with Monster, but that the specifics of the deal could not be disclosed because of nondisclosure agreements. For example:

        i. On or about October 17, 2015, MARGULIES sent an email to BERSHAN with himself and Victim-1 copied. This email was also sent to additional investors in Starship, including Victim-2. The email was entitled, "LETTER OF COMPLIANCE TO SEC REGS FOR THE AWAKE COMPANY, INC.," and was signed by "Joel Margulies/Lisa Bershan." The email stated:

> To our Investors,
> Please read the attached and acknowledge to us that you have done so. . . . The deal as I am certain you have heard is done thanks in no small part to the extraordinary talents and skills of our CEO, Lisa Bershan. If you are not aware of the deal, it is a one to one --- share for share exchange of [Starship] for Monster after a six month holding period of [Starship] shares. The letter attached explains that owing to the requirements of SEC compliance every one invested must have the same opportunity given the current circumstances and some early investors may need more time to review their options.

A letter entitled "SEC COMPLIANCE LETTER" was attached to the email. The letter provided, in substance and in part, "First and foremost let me acknowledge your investment in [Starship] and reiterate my assurance that upside down is a place you will never find yourself as regards this opportunity. The company must now adhere to the rules and regulations of the SEC as the deal papers were signed on Friday, October 16th 2015." The letter continued to state that it was "not a solicitation for additional investments" but nonetheless continued:

> Since mid-September of this year The Awake Company, Inc. has been offering private placement investment opportunities to and through friends and families in back to back seed series offering of common shares.

9

> This offering is presently scheduled to close in ten business days on October 30th at 5PM/EDT or sooner at the digression [sic] of the Company. However, by SEC Regulation, any investor may, if they so elect, add to their current investment position.

The letter was signed by BERSHAN. Based on my review of public records, I understand that the "one to one" share exchange described in the email above would have been extremely lucrative for Starship investors, as Monster shares were trading at over approximately $100 a share at the time.

    ii. Monster did not announce a deal to acquire Starship, or any other deal involving Starship on or about October 30, 2015, as referenced above. On or about November 16, 2015, MARGULIES sent an email to Victim-1 stating, in part, "We want to assure you that your investment is secure. The Awake Company shares you purchased will be exchanged one for one as promised and all efforts are being made to provide the affirming documentation to support the agreements and memos you endorsed. We appreciate your concerns. The deal is on and your shares will be issued shortly."

    iii. On or about January 25, 2016, MARGULIES sent an email to various investors in Starship, including Victim-1, entitled "AWAKE UPDATE." The email, stated, in part, "[Starship] is going forward albeit under the slower than we would wish hand of our beverage partner. All of the formalities have been addressed and assigned and managed in terms of the legal entities. We are now involved in the practical day to day determinations of processing and assigning operations, logistics, personnel, accounting, fulfillment, customer service and so on." Based on my training, experience, and participation in this investigation, I understand that MARGULIES is referring to Monster as Starship's "beverage partner."

    iv. On or about March 13, 2016, MARGULIES sent an email to various investors in Starship, including Victim-2, entitled, "Investor Update." The email stated, in part, "I can tell you that the energy drink company has reiterated its full engagement in the caffeinated snack business. Yes, there have been delays." The email continued to state that "[w]e have stopped taking telephone calls [from investors] because it is not possible to control how and to whom a conversation may be repeated, and not for any other reason."

    v. On or about September 30, 2016, MARGULIES sent an email to Victim-2 entitled, "RE: News just in." In the

10

email, MARGULIES continued to assert, in substance and in part, that Starship was close to finalizing an acquisition by Monster. Specifically, MARGULES stated, in part, "The finger on the deal-closing button is Monster's. WHEN its pushed, everyone will know it's happened."

        vi.    On or about October 18, 2016, SCHWARTZ hosted a conference call with various investors, including Victim-1 and Victim-2. I have reviewed a recording of this call. Based on my review of this recording, I have learned that, during the call, SCHWARTZ stated, in substance and in part, that Starship had received an offer from Monster, but that BERSHAN had rejected it. SCHWARTZ continued to state that Starship was continuing to negotiate a partnership or acquisition with Monster, and also with Coca-Cola. SCHWARTZ further stated that Starship would honor its guarantees to investors to the extent a deal was not effectuated.

        vii.    On or about December 1, 2016, SCHWARTZ sent an email to multiple individuals including Victim-2. This email stated, in substance and in part:

> The final two questions that need to be mentioned are 1. Will we make a deal? and 2. When?
>
> In answer to these questions, I will say that the acquisition team of the investor has put in tremendous time on this deal. . . . In addition the stock split of 3:1 affords our Investor liquidity in investing in Starship. Finally, it is still my opinion that an announcement in an investment in Starship will happen soon. All of the projections that have been submitted and approved lead me to believe that we will be on the shelf with our products in the first quarter of 2017.
>
> Finally, in the past 4 months that I have been involved in improving communications with the shareholders, I have been accused of fraud and scamming the investors. Lisa has been stalked and threatened with bodily harm. Lisa and I will not deal with investors like this . . . . It is my recommendation to these abusive shareholders that they shouldn't bite the hand that is trying to feed them.
>
> I will keep all of you updated as best I can to Starships progress. Because we are dealing with a Public Company, information that has to do with the

>    Public entity and its negotiations with Starship are
>    not public.

Based on my conversations with Victim-1 and my review of public records, I believe that the "stock split of 3:1" referenced above refers to a stock split by Monster announced on or about October 16, 2016, and that SCHWARTZ is referring to Monster as "our Investor."

       viii.    On or about January 11, 2017, SCHWARTZ received an email from another individual who had invested in Starship ("Victim-3"). Victim-3 stated, in part:

>    You need to appreciate, that when I invested in
>    Starship, I was told that before the end of the year,
>    2016, an investment, acquisition, by another company
>    would have taken place. As of today there is no
>    indication that anything is going to take place.
>    Additionally, we have no information regarding where
>    the investment of money has gone. I would appreciate
>    an update regarding the status of an investment, by
>    another company, into Starship. I would also request
>    to see the most recent financial[s] for Starship.

SCHWARTZ then responded, in part, "Right before Christmas through New Years, very little negotiations took place. Negotiations have actively continued but as I have stated before, Starship can only run on the pace of the investor. The investor as you know is a public company and has requested that all negotiations and all financial information that is being shared within the negotiations remain confidential." Based on my training, experience, and participation in this investigation, I believe that the "investor" referenced by SCHWARTZ is Monster.

      b.    Between in or about August 2015 and in or about June 2016, Victim-2 purchased approximately 130,000 shares of Starship stock at a cost of approximately $390,000. In total, BERSHAN, SCHWARTZ, and MARGULIES raised over approximately $2 million from over approximately 30 investors.

### Starship Had No Ability to Honor Its Guarantees

    13.    There is probable cause to believe that neither Starship nor LISA BERSHAN, BARRY SCHWARTZ, nor JOEL MARGULIES, the defendants, had any ability to honor the guarantees provided to Starship investors, and that those guarantees were knowingly

false when made. Based on my review of publicly available information, bank records, and emails, for example, I have learned the following, in substance and in part:

      a. BERSHAN did not own the home depicted in pictures sent to potential Starship investors.

      b. BERSHAN had, at all times relevant to this Complaint, multiple outstanding civil judgments, unpaid tax liens in the States of California, Nebraska, Illinois and New Jersey, and owed thousands of dollars to the Internal Revenue Service.

      c. Neither BERSHAN, SCHWARTZ, nor MARGULIES had significant assets relative to the amount of investor funds they solicited and received in bank accounts held in their own names or the names of the entities discussed herein.

### Representations Regarding a Monster Deal Were False

14. Based on my review of documents provided by Monster, my review of emails, and my conversations with victims who invested in Starship, including Victim-1 and Victim-2, I have learned that Starship was never acquired by Monster, nor did it ever enter into any form of partnership or other relationship with Monster. To the contrary, there is probable cause to believe that Starship was never involved in negotiations with Monster, and that the fictitious prospect of an acquisition was held out to incentivize investments in Starship. I believe this for the following reasons, among others:

      a. Based on my review of documents provided by Monster, I understand that Monster has no records of any electronic or written communications with LISA BERSHAN, BARRY SCHWARTZ, or JOEL MARGULIES, the defendants, or with Starship (including by its previous name, The Awake Company) or any of its representatives; that neither BERSHAN, SCHWARTZ, nor MARGULIES has ever worked for Monster; and that Monster has never entered into any contracts, including nondisclosure agreements, with any of the aforementioned individuals or entities.

      b. I have reviewed email accounts used by SCHWARTZ and MARGULIES in connection with their roles at Starship. In conducting this review, I have not identified any communications with representatives of Monster.

c. Based on my review of bank records and email communications, I do not believe that Starship had active business operations--that is, Starship was not paying costs that would typically be associated with developing and manufacturing a commercial food product. I also know based on my training and experience that it would be highly unusual for a publicly-traded company like Monster to acquire a company, let alone for hundreds of millions of dollars, that had no meaningful operations or intellectual property.

### The Defendants Provide Fraudulent Product Samples to Investors and Misrepresent their Relationship with Arcor

15. Based on my conversations with other law enforcement agents and my review of documents provided by Arcor, I have learned the following, in substance and in part:

   a. On or about November 10, 2015, LISA BERSHAN, the defendant, sent an email to a representative of Arcor stating, in substance and in part, that BERSHAN was "the CEO of G-Force, a newly formed division of The Monster Energy Drink Company." BERSHAN continued to state that she "ha[d] big plans for caffeinated confections" and had "near-term sales projects [sic] [] in nine-figures with the Coca-Cola Company providing our retail distribution." For the reasons described above, there is probable cause to believe that BERSHAN's representations regarding her status as the CEO of a division of Monster are false.

   b. Although a representative of Arcor arranged for samples of certain candies to be sent to BERSHAN, Arcor never produced or sent to BERSHAN samples of a caffeinated product. Nor did Arcor execute a contract with BERSHAN or Starship to develop or manufacture any such products.

16. Based on my conversations with Victim-2 and another individual who invested in Starship ("Victim-4"), I have learned the following, in substance and in part:

   a. LISA BERSHAN, the defendant, provided Victim-2 and Victim-4 with purported samples of Starship's caffeinated chocolate product. These samples were provided, based on Victim-2 and Victim-4's understandings, in order to demonstrate that Starship had a functional product when raising additional funding.

   b. BERSHAN represented that the samples provided to Victim-2 and Victim-4 had been made by Arcor, and that Arcor

14

would manufacture Starship's products going forward. For the reasons described above in paragraph 15, there is probable cause to believe that the purported samples provided to Victim-2 and Victim-4 were actually normal chocolates that were falsely represented to be Starship's signature product.

### The Defendants Misappropriate Investor Funds

17. Based on my review of emails and my conversations with investors, I have learned that LISA BERSHAN, BARRY SCHWARTZ, and JOEL MARGULIES, the defendants, represented to investors that funds would be used for particular purposes related to Starship's purported business. For example, on or about January 5, 2016, MARGULIES sent an email to Victim-2 stating, "We have used the funds raised to accomplish a very long list of essential business building tasks. We have a lot more to do and will use the funds at our disposal to accomplish them as quickly as possible to bring us to market." As discussed below, however, there is probable cause to believe that investor funds were not used for these purposes and were instead misappropriated by BERSHAN, SCHWARTZ, and MARGULIES.

18. Based on my review of bank records and emails, as well as my conversations with investors and law enforcement agents, I have learned the following, in substance and in part:

    a. Investors were primarily directed to transfer or deposit investments in either the WF Star Queens Account or the JPM Starship Accounts. As discussed above, the WF Star Queens Account listed JOEL MARGULIES, the defendant, as the owner of "Star Queens Inc.," and listed LISA BERSHAN and BARRY SCHWARTZ, the defendants, as the signatories. SCHWARTZ and BERSHAN were also listed as signatories for the JPM Starship Accounts, which were opened at a JP Morgan Chase branch in the Southern District of New York and which provided an address for Starship located in the Southern District of New York.

    b. Over approximately $2 million was transferred to or deposited in the WF Star Queens Account and the JPM Starship Accounts from over approximately 50 investors.

    c. BERSHAN, SCHWARTZ, and MARGULIES misappropriated significant amounts of investor funds for personal expenses between in or about August 2015 and at least in or about August 2017. Investor monies were transferred from the JPM Starship Accounts to another account at JP Morgan Chase in the name of "B&L Concepts LLC," for which BERSHAN and SCHWARTZ were listed

as the signatories (the "B&L Account"). The following expenses, for example, were funded from the WF Star Queens Account, the JPM Starship Accounts, and the B&L Account:

   i. Between in or about August 2015 and July 2017, approximately $86,005 was spent on medical care, of which approximately $39,098 was spent on plastic surgery.

   ii. Between in or about August 2015 and July 2017, approximately $209,224 was spent on retail purchases, including jewelry and clothing, and interior decorating.

   iii. Between in or about August 2015 and July 2017, approximately $11,913 was paid to a Mercedes dealership.

   iv. Between in or about August 2015 and July 2017, approximately $37,443 was spent on pet care.

   v. Between in or about November 2015 and November 2016, approximately $282,965 was spent on rent for a Manhattan apartment;

   vi. In or about July 2016, approximately $260,000 was used to make a down payment on a residence that BERSHAN and SCHWARTZ attempted but ultimately failed to purchase in the vicinity of Palm Beach Gardens, Florida.

   vii. Tens of thousands of additional dollars were used to fund personal debit card purchases at restaurants, and to pay for gym memberships and travel expenses; to write checks to MARGULIES; to make cash withdrawals, and to make payments to entities that I understand to be pawn shops located in California and New York.

WHEREFORE, the deponent prays that arrest warrants be issued for LISA BERSHAN, BARRY SCHWARTZ, and JOEL MARGULIES, the defendants, and that they be imprisoned or bailed as the case may be.

ANGELA TASSONE
SPECIAL AGENT, FBI

Sworn to before me this
6th day of October, 2017

HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK